# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KOLAWOLE O T.,** | **Civil Action No. 19-21802 (MCA)** |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **STEVEN AHRENDT, et al.,** | |
| **Respondents.** | |

Petitioner Kolawole O.T. is currently in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and detained at Bergen County Correctional Facility ("Bergen County Jail" or "the Facility") in New Jersey.  On December 23, 2019, Petitioner brought a counseled habeas petition ("the Petition") challenging his prolonged detention.  *See* ECF No. 1.  On April 3, 2020, while the Petition was pending, Petitioner filed an "Emergency Motion for Immediate Release from ICE Detention" requesting the Court order his immediate release from detention due to his serious mental illness and his vulnerability if he were to contract the novel coronavirus disease 2019 ("COVID-19").  ECF No 7.  Respondents oppose the Motion. ECF No. 10.  Having reviewed the parties' detailed submissions, examined the applicable law, directed the parties to provide supplemental information in light of Petitioner's recent hospitalization, and held an oral conference on the matter, the Court grants Petitioner's Motion for a Preliminary Injunction and directs Respondents to immediately release Petitioner subject to the conditions set forth below.

## I.  FACTUAL BACKGROUND

### A.  Petitioner's Immigration History

Petitioner is a native and citizen of Nigeria, and is married to a U.S. citizen and has two U.S. citizen children.  *See* Immigration Judge Decision, dated September 26, 2020 ("IJ Decision"), ECF No. 8-2, Exhibit 6, at 1, 3; Petition ¶ 7.  He entered the United States on or about August 4, 2001, at New York, New York as a non-immigrant student with authorization to remain in the United States for the duration of that status.  *Id.*  Petitioner adjusted his status to conditional lawful permanent resident on October 19, 2009, pursuant to 8 U.S.C. § 1255.  *Id.* The conditions to his lawful permanent resident status were removed on July 23, 2012.  *Id.*

 On or about October 14, 2014, Petitioner was convicted of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 and bank fraud in violation of 18 U.S.C. § 1344 for which he was sentenced to a term of twenty-six months.  *Id.* at 2.

On or about April 28, 2015, DHS served Petitioner with a Notice to Appear charging him with removability pursuant to 8 U.S.C. § 1227 (a)(2)(A)(iii) for having been convicted of an aggravated felony as defined in 8 USC § 1101(a)(43)(M), specifically an "offense involving fraud or deceit in which the loss to the victim or victims exceeds $10,000."  *Id.*

On December 1, 2016, an immigration judge granted a motion for stipulated removal filed by Petitioner and DHS.  *See* Petition, Docket Entry No. 1, Petition ¶ 11.  Petitioner was in immigration detention from September 2016 until January 2017 but was released thereafter.  *Id.* ¶ 13.

On December 18, 2018, ICE re-detained Petitioner.  *See* ECF No. 10-8,  I-830.  On December 21, 2018, an immigration judge granted a motion to reopen Petitioner's proceedings. *See* ECF No. 10-7, Burgus Declaration ¶ 12.  On  September 26, 2019, an immigration judge

issued a written decision denying Petitioner's applications for adjustment of status and waiver of inadmissibility, and also denied Petitioner's application for protection under the CAT, and ordered him removed. *Id.* ¶ 20; ECF No. 10-6, IJ  Decision.  On October 25, 2019, Petitioner appealed the decision of the immigration judge to the Board of Immigration Appeals ("BIA"). *See* Burgus Decl. ¶ 21; ECF No. 10-9, BIA Notice of Appeal.  That appeal is pending before the BIA.

On December 23, 2019, Petitioner filed the Petition challenging his prolonged detention. *See* ECF No. 1.  In February 2020, Petitioner also filed a motion for bond redetermination pursuant to *Diop v. ICE/Homeland Sec.*, 656 F.3d 221 (3d Cir. 2011).  *See* ECF No. 10-10, Bond Determination Decision, dated February 26, 2020.  The immigration judge granted Petitioner a bond hearing and then denied bond finding that Petitioner was a "danger to the community."  *Id.* On March 20, 2020, Petitioner and DHS both appealed the bond decision of the immigration judge to the BIA.  Burgus Decl. ¶ 25.  DHS argued that the immigration judge erred in finding that Petitioner was statutorily eligible for a bond hearing absent an order granting habeas relief. *See* ECF No. 11-6, Notice of Appeal filed by DHS.  That bond appeal is also pending before the BIA.  *Id.*

**B.  Petitioner's Deteriorating Mental Health**

Petitioner has been diagnosed with post-traumatic stress disorder,  depression with anxiety and atypical psychosis.  TRO Motion ¶ 10; *see also* IJ Decision at 5 (noting Petitioner's history of anxiety and PTSD caused by his incarceration).  Petitioner asserts that Respondents have been aware of his PTSD diagnosis since at least June 2019.  *See* ECF No. 11-8, Petitioner's Medical Records.

Petitioner received therapy during his previous detention.  *See* IJ Decision at 5.  During his current detention, Petitioner was initially receiving regular counseling at the Bergen County Jail, most consistently with Dr. Amarjot Narula, until December 2019. ECF No. 26-1, BCJ Medical Records before Transfer.  According to the medical records submitted by Respondents, Dr. Narula saw the Petitioner for "psychiatric visit[s]" on June 25, 2019, July 16, 2019, August 8, 2019, August 20, 2019, September 19, 2019, October 10, 2019, October 11, 2019, and December 12, 2019.  BCJ Medical Records before Transfer at p. 42-43, 55-56, 58-59, 61-62, 67-68, 71-72, 87-88, and 93.  On each of these dates, Dr. Narula provided notes on Petitioner's progress.  *See id.*  For approximately the last five months, however, from December 12, 2019 to early May 2020, the Facility's medical records do not show that Petitioner was seen by a psychiatrist, such as Dr. Narula, or Dr. Diana Riccioli.  *See id.*  Indeed, there are no such progress notes from any doctor regarding Petitioner's psychiatric condition as there were previously.  *See id.*

It is undisputed that Petitioner experienced a serious psychiatric episode on or about May 3, 2020,  *see* BCJ Medical Records before Transfer at 2-3, during the pendency of this matter.  On May 5, 2020, two days after the Petitioner notified the medical staff of his hallucinations, Dr. Riccioli evaluated the Petitioner and ordered that he be transferred to the Bergen New Bridge Medical Center ("BNBMC").[1]   *Id.*   Petitioner received several mental health evaluations, observation, and treatment at BNBMC between May 5 and May 22, and was transferred back to the jail on Friday May 22, after being diagnosed with schizophrenia.  ECF No. 26-3, BCJ Records after Return at p. 42.  The discharging doctor also commented that Petitioner may be exaggerating his symptoms for a secondary gain.  *See id.*

---

[1] BNBMC is an acute and long-term care hospital that also houses a mental health facility.

At Bergen County Jail, Petitioner is now on "enhanced observation" and is currently housed in the Jail's medical unit. *See* ECF No. 26, Respondents' May 26, 2020 Letter. Other than observation, it is not clear what mental health treatment he is being provided at present.

### C.  The COVID-19 Health Crisis

Petitioner's mental health crisis is occurring in the midst of a global health crisis. On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected countries" would increase.[2] Around that time, the United States had reported only approximately 1,000 cases of COVID-19.[3] As of June 4, 2020, that number has risen to over 1.8 million and the virus has taken 107,728 lives nationally.[4] New York and New Jersey have the greatest number of infections and deaths in the nation, with New Jersey reporting a total of 162,530 cases and 11,970 deaths as of June 4, 2020.[5] Hudson County, where Petitioners are detained, currently has the most COVID-19 cases in the state at 18,465 and has 1,199 deaths as of June 4, 2020.[6]

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19 spreads "mainly from person-to-person" between those "who are in close contact with one another (within about 6 feet)" and possibly when people touch contaminated surfaces and then touch their

---

[2] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] *Coronavirus Case Total Climbs in New York*, THE NEW YORK TIMES (Mar. 11, 2020) https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html.

[4] *Coronavirus in the U.S.: Latest Map and Case Count,* THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, (last visited Jun. 4, 2020).

[5] *New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html, (last visited Jun. 4, 2020).

[6] *Id.*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html#county (last visited Jun. 4, 2020).

mouths, noses, or eyes.[7]   The most common symptoms of COVID-19 include fever, cough, and

shortness of breath.[8]   There is presently no vaccine to prevent COVID-19 infections.[9]   The CDC

and health experts thus emphasize the importance of "social distancing" (i.e. staying at least six

feet apart), regularly disinfecting "high touch" surfaces, and wearing cloth face covering to curtail

the spread of the virus.[10]

Experts also still have much to learn about how the virus spreads.   In early April, the CDC

director, Dr. Robert Redfield, in an interview with National Public Radio affiliate WABE, stated

that "a significant number of individuals that are infected actually remain asymptomatic.   That

may be as many as 25 percent[,]" and this is important because asymptomatic individuals

contribute to the transmission of the virus.[11]   Furthermore, those who become symptomatic can

likely transmit the virus up to 48 hours before they show symptoms.[12]   These asymptomatic

transmitters and individuals who are transmitting the virus before they become symptomatic help

explain how rapidly the virus can spread.[13]

---

[7] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited June 10, 2020).

[8] *Id.*; Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited June 10, 2020).

[9] Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html (last visited June 10, 2020).

[10] Ctrs. for Disease Control and Prevention, *supra* note 7.

[11] *CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us; *see also* Apoora Mandavilli, Infected but Feeling Fine: The Unwitting Corona-virus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[12] *Id.*

[13] *Id.* The CDC also states in its guidance that "[s]ome recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms."   Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 27, 2020).

Symptoms of COVID-19 can be mild, and "[a]nyone can have mild to severe symptoms."[14] But certain individuals are at higher risk for severe illness or death if they contract COVID-19. Among them are persons who are "65 and older," those in nursing homes or long-term care facilities, and people of all ages who are immunocompromised, or who have underlying health issues like asthma, chronic lung disease, HIV, heart conditions, diabetes, chronic kidney disease or liver disease, and severe obesity ("CDC Risk Factors").[15]

For complex reasons, individuals with serious mental illness are also particularly vulnerable to infectious diseases,[16] and the public health strategies for preventing and slowing the spread of COVID-19, such as social distancing, "may be less effective for certain marginalized groups, notably those with schizophrenia and related disorders."[17]  As explained by one expert,

> [f]eatures of these disorders, such as delusions, hallucinations, disorganized behavior, cognitive impairment, and poor insight, and sociodemographic characteristics, including living in congregate housing and homelessness, may put these individuals at higher risk of becoming infected with COVID-19. Furthermore, people living with schizophrenia are at greater risk for adverse outcomes,

---

[14] Ctrs. For Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited June 4, 2020).

[15] Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited June 10, 2020).

[16] *See* World Health Org., MANAGEMENT OF PHYSICAL HEALTH CONDITIONS IN ADULTS WITH SEVERE MENTAL DISORDERS 38 (Nov. 7, 2018), https://apps.who.int/iris/bitstream/handle/10665/275718/9789241550383-eng.pdf?ua=1 ("People with [serious mental disorders] are at greater risk than the general population for exposure to infectious diseases."); Hao Yao, et al., *Patients With Mental Health Disorders in the COVID-19 Epidemic*, 7 THE LANCET E21, E21 (Apr. 2020), https://www.thelancet.com/pdfs/journals/lanpsy/PIIS2215-0366(20)30090-0.pdf ("When epidemics arise, people with mental health disorders are generally more susceptible to infections . . . ."); Stanley D. Rosenberg, et al., ASSESSING THE STIRR MODEL OF BEST PRACTICES FOR BLOOD-BORNE INFECTIONS IN CLIENTS WITH SEVERE MENTAL ILLNESS, 61 PSYCHIATRIC SERVS. 885, 885 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3632357/pdf/nihms443299.pdf ("[C]o-infection is markedly elevated for persons with severe mental illness, further increasing morbidity and mortality."); Laura M. Maruschak, et al., PANDEMIC INFLUENZA AND JAIL FACILITIES AND POPULATIONS, 99 AM. J. PUB. HEALTH 339, 342 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4504367/pdf/AJPH.2009.175174.pdf ("Inmates with mental illness pose additional challenges for pandemic planning").

[17] Nicole Kozloff, et al., *The COVID-19 Global Pandemic: Implications for People With Schizophrenia and Related Disorders*, Schizophrenia Bulletin, https://academic.oup.com/schizophreniabulletin/advance-article/doi/10.1093/schbul/sbaa051/5826166 (last visited May 13, 2020).

> including death, because compared with the general population, they
> typically have poorer physical health, greater socioeconomic
> disadvantage, are more socially disconnected, and experience
> pervasive stigma and discrimination.[18]

Thus, in addition to greater susceptibility to infection, treatment may be "more challenging and potentially less effective" in this population, and as a consequence, once they contract a disease, seriously mentally ill individuals face "a 4- to 8-fold risk of death due to infection compared to the general population."[19]  For these reasons, mental- and public-health experts have already begun to sound the alarm about the increased risk that COVID-19 poses to those with serious mental illness.[20]

"The best way to prevent illness is to avoid being exposed to this virus."[21]  But, in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates in correctional facilities, and high-risk detainees and inmates are the most vulnerable to a detention facility's shortcomings.  In its guidance for correctional facilities, the CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."  *See* ECF No. 40-1, CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2.  Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult. Consequently, the CDC Interim Guidance recommends extensive testing, cleaning and quarantining procedures to contain the spread of infection.  *Id.*

---

[18] *Id.* (citation omitted).

[19] Hao Yao, et al., *supra* n.15, at E21.

[20] *See generally*, Hao Yao, et al., *supra* n.15, at E21; Kozloff, et al., *supra* n.16 at 1-2.

[21] *Id.*

For incarcerated individuals with mental illness, quarantine procedures and social distancing, albeit necessary, are a double-edged sword.  Specifically, mental health experts warn that "[e]ssential interventions such as isolation and quarantine will likely worsen pre-existing mental health diagnoses" of persons in detention.[22]  As explained by another expert, "[m]ental health interventions are mostly in person and very time-intensive, and social distancing guidelines don't allow for that now."[23]  Thus, in addition to increased susceptibility to infection and poorer outcomes if they contract COVID-19, individuals with serious mental illness in the prison setting also face further mental health deterioration from the quarantine and isolation procedures and potential interruptions in treatment.

### D.  COVID-19 Protocols at Bergen County Jail

The measures to address COVID-19 at the Bergen County Jail are described in detail in the May 18, 2020 Declaration of Warden Ahrendt ("Ahrendt Decl."), ECF No. 26-4, and include protocols for mitigating the risk of COVID-19 exposure from both external and internal sources.

To mitigate the risk of exposure from external sources, the Facility has suspended all ICE detainee intakes effective March 12, 2020, and is screening new county inmates, staff members, and vendors for the coronavirus.  Ahrendt Decl. ¶¶ 9.A., 9.B., 9.D.  The Facility has also suspended all social visitations and tours, and only "no-contact" visits and telephone conferences are permitted with attorneys.  *Id.*¶ 9.C.

To mitigate the risk of exposure from internal sources, all detainees must remain in their cells at all times, "except for a thirty-minute period each day when they are permitted to exit the

---

[22] Michael Liebrenz, *Caring for persons in detention suffering with mental illness during the Covid-19 outbreak*, Forensic Science International: Mind and Law 1(2020)10013, https://www.sciencedirect.com/science/article/pii/S2666353820300060?via%3Dihub (last visited June 8, 2020).

[23] Bret S. Stetka, MD, Life in Jail, Made Worse During COVID-19: An interview with correctional psychiatrist Elizabeth Ford,  (Apr. 14, 2020) https://www.medscape.com/viewarticle/928586#vp_4

cell area." *Id.* ¶ 9.F.  To promote social distancing during that thirty-minute period, "only six inmates/detainees are permitted to leave the cell area" where they have "2643 square feet of space" for recreational use and showering.  *Id.*  Detainees and inmates have meals inside their cells to avoid congregating.  *Id.* ¶ 9.L.  With respect to cleaning and hygiene, "[a]ll housing units are sanitized no less than four times per day."  *Id.*  Respondents also state that "[t]he Facility provides disinfectant spray, hand sanitizer, and soap in every housing unit," *Id.*  According to the protocol, these cleaning supplies are available for detainees to clean the bathroom, shower, and telephones prior to use and detainees are encouraged to use these supplies. *Id.* In addition, "[i]nmates and detainees have been issued surgical masks, and all inmates and detainees wear their issued masks any time that they are out of their cells."[24]  *Id.* ¶ 9.N.  Similarly, staff at the facility have been provided with masks and are instructed to wear them in the Facility, and gloves are also available when necessary.  *Id.* ¶ 9.E.  According to Warden Ahrendt, the Facility has not experienced any shortages of cleaning supplies or personal protective equipment ("PPE").  *Id.* ¶ 9.L.

The Facility also has isolation and quarantine protocols for confirmed and suspected cases of COVID-19.  Confirmed cases that do not require hospitalization are isolated in a designated area.  *Id.* ¶ 9.H.  Symptomatic inmates or detainees who are awaiting test results are quarantined. *Id.*  Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for fourteen-day period.  *Id.* ¶ 9.J. Cohorting ends if no new COVID-19 case develops within that period.  *Id.*

The Facility has an on-site physician who is on-call 24/7 for emergencies and has added additional medical staff.  *Id.* ¶ 7.  Detainees and inmates are permitted to make daily sick calls to

---

[24] According to the Warden, all staff members have also been issued surgical masks to wear inside the facility.  *See* Ahrendt Decl. ¶ 9.E.  The protocol for detainees is somewhat unclear, as the Ahrendt Declaration first states that only symptomatic detainees are provided with surgical masks but later states that all detainees have been provided with a surgical mask to be worn outside his or her cell.  *See id.* ¶¶ 9.H, 9.N.

on-site medical staff. *Id.* ¶ 9.H. If detainees or inmates complain of illness, medical staff evaluates them. *Id.* Those who present with COVID-19 symptoms are provided a "surgical mask." *See id.* Detainees and inmates may be transported to a hospital for evaluation at the direction of the medical director. *See id.*

Warden Ahrendt's May 18, 2020 Declaration states that twenty-six County Corrections Police Officers and five Nurses who work at the Facility have tested positive for COVID-19. *Id.* ¶ 9.P.4. According to the ICE website, there are two confirmed cases of COVID-19 among ICE detainees.[25] According to the May 18, 2020 Declaration, there is one ICE detainee and one inmate suspected cases of COVID-19 in the Facility who are on medical observation. *Id.* ¶ 9.P.2.

## II.   STANDARDS OF REVIEW

### A.   Preliminary Injunction

Motions for temporary and preliminary injunctive relief are governed by a four-factor test.[26] The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "[he or she] can win on the merits." *Id.* This showing must be "significantly better than negligible but not necessarily more likely than not." *Id.* The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief. *Id.* If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to

---

[25] U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (last visited June 9, 2020).

[26] The Court considers Petitioner's motion as a request for a preliminary injunction because it will be issued with notice to the adverse party pursuant to Rule 65, and because it seeks to alter, rather than maintain, the status quo. *See Hope v. Warden York Cty. Prison*, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020) (precedential) (addressing jurisdiction only and finding TRO issued by district court to be an appealable injunction).

balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. *Id.* at 176, 179. The Court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. *Id.* at 179.

### B.     The "Extraordinary Circumstances Standard" for Bail

The parties agree that the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) establishes that "extraordinary circumstances" are required before "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition." *Id.* at 367. Citing *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), the Third Circuit in *Lucas* noted that extraordinary circumstances may be established where the district judge had ordered a state inmate released to enter a hospital because the inmate was extremely ill. *Id.* at 366-67. The panel, however, did not expressly limit the finding of extraordinary circumstances to situations involving a petitioner's poor health. *Id.* at 367. Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017). Recent decisions, including a decision by this Court, have applied this standard to determine whether extraordinary circumstances exist in the context of the COVID-19 pandemic to grant bail to immigration habeas petitioners. *See, e.g., Cristian A.R. v. Decker*, No. 20-3600, 2020 WL 2092616 *13 (D.N.J. Apr. 12, 2020); *Rafael L.O.*, No. 20-3741, 2020 WL 1808843, at *5 (D.N.J. Apr. 9, 2020); *Coronel v. Decker*, No. 20-2472, 2020 WL 1487274, at *8

(S.D.N.Y. Mar. 27, 2020) (applying an analogous Second Circuit standard set forth in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001)).

III.    **DISCUSSION**

    a.  **Likelihood of Success on the Merits**

        i.  **Petitioner's Challenge to Prolonged Detention**

The Government argues that Petitioner is unlikely to succeed on the merits of his procedural due process claim challenging his prolonged detention because he is lawfully detained under the mandatory detention provisions of 8 U.S.C. § 1226(c), is statutorily ineligible for release, and has not been subjected to any unreasonable delays in his removal proceedings.  ECF No. 10, Answer at 15-22.  Respondents also argue that Petitioner already received the only relief he can receive from this Court – a bona fide hearing before an Immigration Judge.  *See id.* at 23-25.

From the outset, Respondents' argument that *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018) abrogated the Third Circuit's holdings in *Diop v. ICE/Homeland Sec.* 656 F.3d 221, 231 (3d Cir. 2011) and *Chavez–Alvarez v. Warden York County Prison*, 783 F.3d 469 (3d Cir. 2015) is correct only to the extent those decisions rely on constitutional avoidance and read an implicit limitation of reasonableness into § 1226(c).  Numerous courts in this District have found "[t]he constitutional reasoning that underlay the Third Circuit's invocation of the constitutional avoidance canon still provides some persuasive guidance to how this Court should address § 1226(c) claims"  *Dryden v. Green*,  321 F. Supp.3d  496, 501 (D.N.J. 2018) (finding that as-applied challenges remain viable post-*Jennings*); *see also Borbot v. Warden Hudson County Correctional Facility*, 906 F.3d 274, 278 (3d Cir. 2018) ("*Jennings* did not call into question our constitutional holding in *Diop* that detention under § 1226(c) may violate due process if unreasonably long.").

Indeed, courts in this District have found that detention lasting beyond one year under §1226(c), without an individualized bond hearing, violates due process.  *See De Oliveira Viegas v. Green*, 370 F. Supp. 3d 443, 448-49 (D.N.J. 2019) (15 months) (citing *Thomas C. A. v Green*, No. 18-1004, 2018 WL 4110941, at *5-6 (D.N.J. Aug. 29, 2018) (15 months) and *K. A. v. Green*, No. 18-3436, 2018 WL 3742631, at *4 (D.N.J. Aug. 7, 2018) (19 months)).

Here, Petitioner has been detained over seventeen months, well beyond the outer one-year limit established in *Chavez-Alvarez*.  *See* 783 F.3d at 478 (holding that "beginning sometime after the six-month timeframe [upheld by the Supreme Court in *Demore v. Kim*, 538 U.S. 510, 532–33 (2003),] and certainly by the time [the petitioner] had been detained for one year, the burdens to [the petitioner's] liberties [will outweigh] any justification for using presumptions to detain him without bond to further the goals of the statute.").  There is no evidence before the Court that Petitioner is gaming the system or otherwise trying to delay the adjudication of his immigration case.[27]

Petitioner's challenge to his prolonged detention is complicated by the fact that he recently received a bond hearing before an Immigration Judge in February 2020.  Burgess Decl. ¶¶ 23-24.  The Immigration Judge denied bond, and <u>both</u> Petitioner and the DHS appealed that decision to the BIA.  *See* Notice of Appeal filed by DHS.  Notably, DHS argued before the BIA that the Immigration Judge lacked jurisdiction to conduct the bond hearing, but argues in this proceeding that Petitioner's challenge to prolonged detention is moot because he received a bona fide bond hearing.  Both positions cannot be true.  Because the BIA has not yet resolved the bond appeal and

---

[27] On the issue of bad faith, *Chavez-Alvarez* acknowledged that "[a]n argument could be made that aliens who are merely gaming the system to delay their removal should not be rewarded with a bond hearing that they would not otherwise get under the statute."  783 F.3d at 476.  Because the court concluded that Chavez–Alvarez did not act in bad faith in challenging his removal, it declined to decide whether a detainee's delay tactics should preclude a bond hearing.  *Id.* at 476.

may determine that the bond hearing was improperly conducted, the Court declines to find Petitioner's current challenge to his prolonged detention is moot and also declines to otherwise review the Immigration Judge's bond determination, as those issues are properly before the BIA.[28]

To the extent Petitioner's challenge to his prolonged detention must await the outcome of his bond appeal before the BIA, that determination may take months; however, Petitioner may be entitled to interim habeas relief if he can establish a likelihood of success on his substantive due process claim that his detention during the COVID-19 health crisis amounts to punishment and has met the "extraordinary circumstances" test for bail.  As such, the Court turns to the merits of his substantive due process claim(s).

### ii.  Petitioner's Substantive Due Process Claims

In his TRO Motion, Petitioner asserts that his detention during the COVID-19 health crisis amounts to punishment and that Respondents have denied him adequate medical treatment for his serious mental health conditions.  ECF No. 7.  The Court begins with Petitioner's claim that his detention during the COVID-19 pandemic amounts to punishment.

Recent decisions in this District have established the legal backdrop governing conditions of confinement claims brought by civil detainees.  *See, e.g., Cristian A.R.*, 2020 WL 2092616; *Rafael L.O.*, 2020 WL 1808843.  Civil detainees are entitled to due process and may bring conditions of confinement claims under the Due Process Clause of the Fifth (or Fourteenth) Amendment as opposed to the Eighth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979); *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).  The Fifth and Fourteenth Amendments protect civil detainees like Petitioner from any—*not just "cruel and unusual"*—punishment.  *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005).

---

[28] As explained by Respondents, this Court may not "simply reweigh the traditional bond factors of flight risk and danger to the community" as determined by the Immigration Judge.  *See* Answer at 13.

To determine whether Petitioner's conditions of confinement constitute punishment, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective, and if they are not, it may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'" *E.D. v. Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). A condition or deprivation amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; or the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)). The Court considers "the totality of the circumstances within an institution" to determine whether given conditions constitute punishment. *Hubbard*, 399 F.3d at 160 (internal quotation marks and citation omitted). Civil detainees, like inmates, may be entitled to relief if they prove threats to personal safety from exposure to serious contagious diseases. *Cristian A.R.*, 2020 WL 2092616, at *9-10 (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

The protocols currently in effect at Bergen County Jail are not meaningfully distinguishable from those in effect at Bergen County Jail when the Court decided *Cristian A.R.*, 2020 WL 2092616, at *10-12, *Asmed B. v. Decker*, No. 20-3734, 2020 WL 2539351, at *9 (D.N.J. May, 19, 2020) or *Anthony O. v. Decker*, No. 20-3856, 2020 WL 2571897, at *6 (D.N.J. May 20, 2020). In each of those recent decisions, the Court determined that the protocols at Bergen County Jail were insufficient to protect the most vulnerable detainees in their care. *See, e.g.*, *Anthony O.*, 2020 WL 2571897, at *6 (explaining that the existing protocols at Bergen County Jail were "largely unchanged from those the Court considered in *Cristian A.R.*").

As noted above, Warden Ahrendt's latest Declaration states that detainees have now been provided surgical masks to wear when outside their cells and the updated Declaration also clarifies that cleaning supplies have been made available to detainees to sanitize shared spaces and items; he further reports that there are no shortages in cleaning supplies at the Facility. *See* May 18, 2020 Ahrendt Decl. at ¶¶ 9.N; 9.L. For the reasons already explained in *Asmed B* and *Anthony O.*, these improvements to the protocol, while laudable, do not change the Court's determination that the Facility does not sufficiently protect the most medically vulnerable detainees in their care.[29]

One difference between Petitioner's case and those of the petitioners in *Cristian A.R.,* and *Rafael L.O.* is that Petitioner suffers from serious mental illness rather than physiological conditions. Respondents argue that Petitioner, who does not have a CDC Risk Factor for COVID-19, fails to advance a theory for his release other than his fear of contracting COVID-19, *see* Answer at 19-20. The Court disagrees.

In *Jose B.R. v. Tsoukaris*, No. 20-3347, 2020 WL 2744586, at *12 (D.N.J. May 27, 2020), the Court ordered the immediate release of a petitioner at Essex County Correctional Facility (ECCF) with a schizophrenia-spectrum disorder, who presented evidence that persons living with schizophrenia are more susceptible than the general population to infections and are at higher risk of serious complications and a poor outcome were they were to contract COVID-19. *See id.* The petitioner also presented evidence that his symptoms had significantly worsened from the prior

---

[29] Respondents also argue that "since the start of the recent pandemic, a total of two ICE detainees and one Bergen County inmate housed at the Bergen County Jail have tested positive for COVID-19[ ]" and [s]ince the last declaration was submitted on April 10, there have been no new positive cases among the inmate/detainee population" at the Facility. Respondents' May 26, 2020 Letter at 2. Respondents do not provide the Court with any information about how many detainees and inmates at Bergen County Jail have been tested for COVID-19 to date, and without that information, the Court is unable to determine whether the lack of additional positive tests is indicative of successful measures to contain the virus or simply a failure to test detainees and inmates for the virus, as recommended by the CDC Interim Guidance.

year and that his detention contributed to the worsening of his symptoms.  *See id.*  In granting release, the Court also noted that Judge McNulty had recently granted a temporary restraining order, requiring immediate release, for a mentally ill, 23-year-old petitioner detained in immigration custody at Hudson County Correctional Facility in Kearny, New Jersey.  *See No.* 20-3430, 2020 WL 1922140 (D.N.J. Apr. 21, 2020).  Judge McNulty noted that "[t]his decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case." *Id.* at *1; *see also Doe v. Barr*, No. 20-2263, 2020 WL 1984266, at *6 (N.D. Cal. Apr. 27, 2020) (finding that detention of detainee with severe posttraumatic stress disorder and major depressive disorder with psychotic features amounted to punishment).

So too, under the unique circumstances of this case, Petitioner has provided sufficient evidence of his serious mental illness and his worsening mental health during the COVID-19 pandemic, resulting in a psychiatric episode, *see* BCJ Medical Records prior to Transfer, and two-week hospitalization during the pendency of this proceeding, during which he was diagnosed with schizophrenia.  *See* BCJ Records after Return at p. 42.  Furthermore, Respondents' assertion that Petitioner has been receiving ongoing mental health monitoring and treatment during his entire detention at Bergen County Jail is not supported by the record and Respondents' own evidence appears to show that they have not provided Petitioner with consistent mental health counseling in the five-month period prior to his psychiatric episode.  *See* BCJ Medical Records before Transfer.

Notably, Respondents do not dispute that they are aware that Petitioner suffers from PTSD, depression with anxiety, and atypical psychosis.  And while they provided mental health counseling from June 2019 through mid-December 2019, the medical records indicate that no therapy for his PTSD or anxiety was provided from December 2019 to the present. *See id.*  Rather

it appears that there were minimal attempts by the medical professionals to treat Petitioner because he, like many individuals who suffer from mental illness, would not take his prescribed medications. Although it is unclear whether the COVID-19 health crisis impacted the provision of mental health services, it was not until Petitioner experienced serious hallucinations during the pendency of this action that Respondents transferred him to BNBMC for evaluation and treatment. *See id.* He has since been returned to the facility and is under "medical observation," but Respondents have provided no details about whether he is being provided ongoing mental health counseling or other support.[30] Respondents' May 26, 2020 Letter. The Court raises these medical care issues to highlight the extraordinary circumstances surrounding Petitioner's detainment during this global crisis.

For all these reasons, the Court is satisfied that Petitioner has demonstrated a likelihood of success on the merits of his claim that his conditions of confinement during the COVID-19 pandemic amounts to punishment under the Due Process Clause.[31]

### b. Irreparable Harm and Extraordinary Circumstances Warranting Release

To be entitled to a preliminary injunction, a movant must also establish that he or she is "more likely than not" to suffer irreparable harm absent the requested relief. *See Reilly*, 858 F.3d at 179. Respondents argue that Petitioner cannot meet the irreparable harm requirement because

---

[30] Respondents also report that ICE plans to provide Petitioner with an individualized custody redetermination in light of the Order issued in *Fraihat v. United States Immigration and Customs Enforcement*, Case No. EDCV 19-1546 (JGB) from the Central District of California but have not provided the Court with the timeframe for that hearing. *See* Respondents Supplemental letter at 2.

[31] Civil detainees also have a constitutional right to adequate medical care, including the creation of policies ensuring adequate health care, and such claims are governed by the deliberate indifference standard. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address inmates' immediate medication needs constituted deliberate indifference); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 585 (3d Cir. 2004) (detention center's lack of policies to address the physical and mental health needs of residents caused the plaintiff harm). Because the Court finds that Petitioner is likely to succeed on his claim that his conditions amount to punishment and because deliberate indifference has a more stringent *mens rea* requirement, it need not reach the deliberate indifference claim.

his likelihood of contracting COVID-19 is speculative in light of the precautions ECCF and because his injury is not redressable by release. [32]  Answer at 28-32.

The Court disagrees that Petitioner's likelihood of contracting COVID-19 is speculative for the reasons already highlighted above.  As the Supreme Court observed in *Helling*, "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  509 U.S. at 33 (noting that "the Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event").  Furthermore, his likelihood of contracting COVID-19 at home with his wife and children is drastically lower than his likelihood of contracting the virus in a carceral setting, such as Bergen County Jail.

### c.   Balancing of the Equities and the Public Interest

"Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merch Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted).  Here, the Court finds the potential of injury to Petitioner is high for all the reasons set forth above.  In *Cristian A.R.*, the Court also found that the public interest supported the release of Petitioners before they contract COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems.  *See* 2020 WL 2092616, at *13 (citing *Rafael L.O.*, 2020 WL 1808843, at *9).  The same is true here, albeit to a

---

[32] Respondents also cite to *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir.1994) (reversing grant of preliminary injunction compelling county to issue a building permit because plaintiff would not suffer irreparable harm by delaying building and injunction did not maintain the status quo) for the proposition that "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." Answer at 12 (citing *id.* at 653).  Here, Petitioner has met this burden through evidence of his deteriorating mental health and his susceptibility to complications and a poor outcome should he contract COVID-19.

lesser extent, as hospitalizations in New Jersey have declined in the weeks since the Court issued its decision in *Cristian A.R.*[33]

Respondents also have a legitimate interest in ensuring that Petitioner does not flee and in protecting the public. As Judge Vasquez found in *Rafael L.O.* and this Court recently found in *Cristian A.R.*, those very important interests are adequately addressed by fashioning appropriate conditions of release. *See Cristian A.R.*, 2020 WL 2092616, at *13. Petitioner has 2014 convictions for conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 and bank fraud in violation of 18 U.S.C. § 1344. This history involves nonviolent offenses, and Petitioner has significant ties to this country, including his U.S. citizen wife and children, such that he can be safely released on reasonable conditions of supervision. The Court is also satisfied that there are reasonable conditions that can adequately protect the public and Petitioner and ensure his appearance for future immigration proceedings. The specific conditions of release are set forth in the Order accompanying this Opinion.

### d. Extraordinary Circumstances Warranting Release on Bail

Finally, the Court also finds that totality of the circumstances here and particularly Petitioner's deteriorating mental health during this global health crisis and his own recent mental health crisis warrant the extraordinary remedy of release on bail, and make bail necessary, to make the habeas remedy effective. *See Lucas*, 790 F.2d at 366-67 (noting that extraordinary circumstances may be established where an inmate is extremely ill); *Jose B.R.*, 2020 WL 2744586, at *13 (immigration detainee with schizophrenia-spectrum disorder who provided evidence of deteriorating mental health during global pandemic established extraordinary

---

[33] *See N.J. coronavirus deaths increase to 11,970 with 162,530 total cases. Hospitalizations fall below 2,000 for 1st time in months,* NJ.com (Jun. 4, 2020), https://www.nj.com/coronavirus/2020/06/nj-coronavirus-deaths-increase-to-11970-with-162530-total-cases-hospitalizations-fall-below-2000-for-1st-time-in-months.html,.

circumstances under *Lucas*); *see also S.N.C. v. Sessions*, No. 18-7680, 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (ordering release of immigration detainee who had PTSD and was a victim of abuse and trafficking to allow her to access to counselling and to care for her eight children and finding these circumstances "extraordinary" under *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001)); *United States v. Mett*, 41 F.3d 1281, 1282 n.4 (9th Cir. 1995) (internal quotation marks omitted) (noting that "[s]pecial circumstances" warranting bail for habeas petitioners "include a serious deterioration of health while incarcerated").

**IV.   CONCLUSION**

     For the foregoing reasons, Petitioner's Emergency Motion for a Preliminary Injunction, ECF No. 7, is **GRANTED**, and the Court orders Petitioner's immediate release subject to the conditions as ordered.  An appropriate Order accompanies this Opinion.

Dated:  June 10, 2020

                                     */s Madeline Cox Arleo*
                                     **Hon. Madeline Cox Arleo**
                                     **UNITED STATES DISTRICT JUDGE**